AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means (USAO Rev. 12/20)

# UNITED STATES DISTRICT COURT
### for the
Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| The premises located at 17808 Maplehurst Place, Canyon Country, California 91387 | ) ) ) | Case No.   2:21-MJ-03211 |
| Described further in Attachment A | ) ) ) | |

**FILED**
CLERK, U.S. DISTRICT COURT

07/08/21

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ jm _____ DEPUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §2252A | *Offense Description*<br>Intent to View and possession of child pornography |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

_____
*Applicant's signature*

Victoria J. Scott, ICE, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: ____07/08/21____

_____
*Judge's signature*

City and state: Los Angeles, CA

Hon. Maria A. Audero
*Printed name and title*

AUSA:   Christopher Brunwin- 213-894-4242

## ATTACHMENT A

<u>PREMISES TO BE SEARCHED</u>

    The SUBJECT PREMISES is located at 17808 MAPLEHURST PLACE, CANYON COUNTRY, CALIFORNIA 91387. The SUBJECT PREMISES is on the south side of Maplehurst Place, two houses west of Partridge Drive. It is a two-story gray brick and beige stucco residence with a three-car garage and dark gray shingles on the roof. The number "17808" is above the garage door. The front entry is on the west side/right side of the residence.



i

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 2252A(a)(5)(B) (access with intent to view and possession of child pornography) (the "Subject Offenses"), namely:

        a.    Child pornography, as defined in 18 U.S.C.    § 2256(8).

        a.    Any digital device used to facilitate the above-listed violations and forensic copies thereof.

        b.    With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

                i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

                ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

                iii.  evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as

telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

**A.   SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

c.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

d.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

e.    The team searching the digital data also may use sophisticated tools, such as forensic hashing tools, to identify child pornography (including, but not limited to, "Encase" and "Forensic Tool Kit," or "FTK"). Forensic hashing is the process of using a mathematical function, often called an algorithm, to generate a numerical identifier for data (such as a particular file). If the data is changed, even very slightly (such as the addition or deletion of a comma or a period), the identifier should change. A hash value can be thought of as a "digital fingerprint" for data. The team searching digital devices in this case will also use a "hash set," which contains the hash values of image and video files associated with known identified victims of child pornography to determine whether these files are stored within digital devices. Because this "hash set" is constantly being updated as investigations result in the rescue of children depicted in child pornography images/videos, it will

not contain the hash values of all currently identified image and video files. The team searching the digital devices will only use search protocols specifically selected to identify items to be seized under this warrant.

f.    When searching a digital device pursuant to the specific search protocols selected, the search team shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

g.    If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

h.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

i.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

j.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain

forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

k.   The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending). Otherwise, the government must return the device.

l.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

     c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

     d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

     e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

     f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

     g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

    6.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

Case 2:21-mj-03211-DUTY *SEALED* Document 2-1 Filed 07/08/21 *SEALED* Page 10 of 39 Page ID #:10

**AFFIDAVIT**

I, VICTORIA J. SCOTT, being duly sworn, declare and state as
follows:

## I. INTRODUCTION

1.   I am a Special Agent ("SA") with the United States
Department of Homeland Security ("DHS"), Immigration and Customs
Enforcement ("ICE"), Homeland Security Investigations ("HSI") in
Los Angeles, California, and I have been so employed since June
2019. I am currently assigned to HSI Ventura, which is tasked
with investigating federal crimes involving child exploitation,
child pornography, cybercrimes, immigration crimes, human rights
violations and human smuggling, smuggling of narcotics, weapons,
and other types of contraband, financial crimes, and various
other violations of immigration and customs laws. I have
received training in the area of child pornography and child
exploitation and observed and reviewed various examples of child
pornography in all forms of media, including computer media. I
have also participated in the execution of numerous search
warrants, many of which involved child exploitation and/or child
pornography offenses.

2.   Through my training and experience, I have become
familiar with the methods of operation used by people who are
involved with offenses involving the sexual exploitation of
children. I have attended training classes and seminars
concerning computer crimes and the sexual exploitation of
children on the Internet. This training has given me an
understanding of how people involved with offenses relating to

the sexual exploitation of children use the Internet to further those offenses. My experience in investigations in this regard has supplemented my understanding of how people involved in offenses relating to the sexual exploitation of children use the Internet to further those offenses.

## II. <u>PURPOSE OF AFFIDAVIT</u>

3.   This affidavit is made in support of an application for a warrant to search the residence located at 17808 Maplehurst Place, Canyon Country, California 91387, as further described in Attachment A, which is attached hereto and incorporated herein by reference, and to seize evidence, fruits, and instrumentalities, as specified in Attachment B, which is also attached hereto and incorporated by reference, of violations of 18 U.S.C. § 2252A(a)(5)(B) (access with intent to view and possession of child pornography) ("SUBJECT OFFENSES").

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and investigators. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. BACKGROUND ON CHILD EXPLOITATION OFFENSES, COMPUTERS, THE INTERNET, AND DEFINITION OF TERMS

5. In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256. The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

6. Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers with child pornography:

a. <u>Computers and Child Pornography</u>. Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. Child pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats. The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

b. <u>File Storage</u>. Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage"). Computer users

frequently transfer files from one location to another, such as from a phone to a computer or from cloud storage to an external hard drive. Computer users also often create "backup," or duplicate, copies of their files. In this way, digital child pornography is extremely mobile and such digital files are easily reproduced and transported. For example, with the click of a button, images and videos containing child pornography can be put onto external hard drives small enough to fit onto a keychain. Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets. Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device. Therefore, viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

c. _Internet_. The term "Internet" is defined as the worldwide network of computers -- a noncommercial, self-governing network devoted mostly to communication and research with roughly 4.6 billion users worldwide. The Internet is not an online service and has no real central hub. It is a collection of tens of thousands of computer networks, online services, and single user components. In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

4

        d.   <u>Internet Service Providers ("ISP")</u>. Individuals and businesses obtain access to the Internet through ISPs. ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP. ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them. Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

        e.   <u>IP Addresses</u>. An Internet Protocol address ("IP Address") is a unique numeric address used to connect to the Internet. An IPv4 IP Address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). In simple terms, one computer in a home may connect directly to the Internet with an IP Address assigned by an ISP. What is now more typical is that one home may connect to the Internet using multiple digital devices simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems, by way of example. Because the home subscriber typically only has one Internet connection and is only assigned one IP Address at a time by their ISP, multiple devices in a home are connected to

the Internet via a router or hub. Internet activity from every device attached to the router or hub is utilizing the same external IP Address assigned by the ISP. The router or hub "routes" Internet traffic so that it reaches the proper device. Most ISPs control a range of IP Addresses. The IP Address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP Address is only assigned for the duration of that online session. Most ISPs maintain records of which subscriber was assigned which IP Address during an online session.

      f.   <u>IP Address – IPv6</u>. Due to the limited number of available IPv4 IP addresses, a new protocol was established using the hexadecimal system to increase the number of unique IP addresses. An IPv6 consists of eight sets of combination of four numbers 0-9 and/or letters A through F. An example of an IPv6 IP address is 2001:0db8:0000:0000:0000:ff00:0042:8329.

      g.  The following definitions:

        i.  "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

        ii.  "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene

6

or do not necessarily depict minors engaging in sexually
explicit conduct.

        iii. "Child pornography," as defined in 18 U.S.C.
§ 2256(8), is any visual depiction, including any photograph,
film, video, picture, or computer or computer-generated image or
picture, whether made or produced by electronic, mechanical or
other means, of sexually explicit conduct, where: (a) the
production of the visual depiction involved the use of a minor
engaged in sexually explicit conduct; (b) the visual depiction
is a digital image, computer image, or computer-generated image
that is, or is indistinguishable from, that of a minor engaged
in sexually explicit conduct; or (c) the visual depiction has
been created, adapted, or modified to appear that an
identifiable minor is engaged in sexually explicit conduct.

        iv. "Cloud-based storage," as used herein, is a
form of digital data storage in which the digital data is stored
on remote servers hosted by a third party (as opposed to, for
example, on a user's computer or other local storage device) and
is made available to users over a network, typically the
Internet. Users of such a service can share links and associated
passwords to their stored files with other traders of child
pornography in order to grant access to their collections. Such
services allow individuals to easily access these files through
a wide variety of electronic devices such as desktop and laptop
computers, mobile phones, and tablets, anywhere and at any time.
An individual with the password to a file stored on a cloud-
based service does not need to be a user of the service to

access the file. Access is typically free and readily available
to anyone who has an Internet connection.

        v.  "Computer," as used herein, refers to "an
electronic, magnetic, optical, electrochemical, or other high
speed data processing device performing logical or storage
functions, and includes any data storage facility or
communications facility directly related to or operating in
conjunction with such device" and includes smartphones, other
mobile phones, and other mobile devices. *See* 18 U.S.C.
§ 1030(e)(1).

        vi.  "Computer hardware," as used herein,
consists of all equipment that can receive, capture, collect,
analyze, create, display, convert, store, conceal, or transmit
electronic, magnetic, or similar computer impulses or data.
Computer hardware includes any data-processing devices
(including central processing units, internal and peripheral
storage devices such as fixed disks, external hard drives,
"thumb," "jump," or "flash" drives, which are small devices that
are plugged into a port on the computer, and other memory
storage devices); peripheral input/output devices (including
keyboards, printers, video display monitors, and related
communications devices such as cables and connections); as well
as any devices, mechanisms, or parts that can be used to
restrict access to computer hardware (including physical keys
and locks).

        vii. "Computer software," as used herein, is
digital information which can be interpreted by a computer and

any of its related components to direct the way they work.
Computer software is stored in electronic, magnetic, or other
digital form. It commonly includes programs to run operating
systems, applications, and utilities.

                viii.     "Computer passwords and data security
devices," as used herein, consist of information or items
designed to restrict access to or hide computer software,
documentation, or data. Data security devices may consist of
hardware, software, or other programming code. A password (a
string of alpha-numeric characters) usually operates what might
be termed a digital key to "unlock" particular data security
devices. Data security hardware may include encryption devices,
chips, and circuit boards. Data security software may include
programming code that creates "test" keys or "hot" keys, which
perform certain pre-set security functions when touched. Data
security software or code may also encrypt, compress, hide, or
"booby-trap" protected data to make it inaccessible or unusable,
as well as reverse the process to restore it.

                ix.  "Encryption" is the process of converting
data into a code in order to prevent unauthorized access to the
data.

                x.   An "Internet Protocol address" or "IP
address," as used herein, refers to a unique numeric or
alphanumeric string used by a computer or other digital device
to access the Internet. Every computer or device accessing the
Internet must be assigned an IP address so that Internet traffic
sent from and directed to that computer or device may be

directed properly from its source to its destination. Most
Internet Service Providers ("ISPs") control a range of IP
addresses. IP addresses can be "dynamic," meaning that the ISP
assigns a different unique number to a computer or device every
time it accesses the Internet. IP addresses might also be
"static," if an ISP assigns a user's computer a particular IP
address that is used each time the computer accesses the
Internet. ISPs typically maintain logs of the subscribers to
whom IP addresses are assigned on particular dates and times.

      xi. "Log files" are records automatically
produced by computer programs to document electronic events that
occur on computers. Computer programs can record a wide range of
events including remote access, file transfers, logon/logoff
times, and system errors. Logs are often named based on the
types of information they contain. For example, web logs contain
specific information about when a website was accessed by remote
computers; access logs list specific information about when a
computer was accessed from a remote location; and file transfer
logs list detailed information concerning files that are
remotely transferred.

      xii. "Minor," as defined in 18 U.S.C. § 2256(1),
refers to any person under the age of eighteen years.

      xiii. "Mobile applications," as used herein,
are small, specialized programs downloaded onto mobile devices
that enable users to perform a variety of functions, including
engaging in online chat, reading a book, or playing a.

xiv. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

xv. "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

xvi. "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

xvii. A "storage medium" or "storage device" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

xviii. "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

xix. A "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

### IV. **SUMMARY OF PROBABLE CAUSE**

7. As set forth in greater detail below, Robert Quido STELLA ("STELLA"), who resides at the SUBJECT PREMISES, has been linked to an online community of individuals who use the darknet[1] with the intent to access child pornography and to sexually abuse children. STELLA used the darknet weblink Uniform Resource Locator ("URL") "365c7q5jvm5c5rbz.onion" to knowingly access "365 CP", a Child Sex Abuse Material ("CSAM") website on approximately July 13, 2020. At the time the child pornography was accessed, STELLA used Coinbase, a cryptocurrency exchange platform, to make a bitcoin transactional payment on July 13, 2020 to the wallet "1D3aQThytRGxD8xHefdhmvJqnMvHa55qhc" to gain access to "365 CP". Additionally, STELLA provided the SUBJECT PREMISES, his full name Robert Quido STELLA, email address rob.stella1@gmail.com, phone number ending in -9249, and year of birth 1972, in his transactional payment.

8. I reviewed screen captures of the Tor-Hidden-Service "365 CP" start page, which contained twelve images containing

---

[1] The darknet is an overlay network within the Internet that can only be accessed with specific software, configurations, or authorization. The darknet often uses a unique customized communication protocol and is most often used for file hosting and peer-to-peer file sharing with the intent of being anonymous and secure.

child pornography, also referred to as "CSAM." Based on my
training and experience, a visitor to this start page would know
the contents of the site before making a payment to access the
site. Based on these facts, and as further set forth believe,
there is probable cause to believe that evidence, fruits, or
instrumentalities of the SUBJECT OFFENSES will be found at the
SUBJECT PREMISES.

### V. BACKGROUND ON TOR-HIDDEN-SERVICE "365 CP" USING URL HTTP://365C7Q5JVM5C5RBZ.ONION

9.    On or about May 10, 2021, I received information from
HSI Cyber Crimes Center (C3) regarding an investigation
initiated by German Federal Criminal Police Office,
Bundeskriminalamt (BKA) into Tor-Hidden-Service "365 CP:"

a.    https://365c7q5jvm5c5rbz.onion is a website
platform that appears to have been developed to allow users to
connect online for the purposes of viewing and/or downloading
CSAM.

b.    To use this website, a user first uses a Tor
browser, a web browser that anonymizes a user's web traffic, to
access the darknet web. The user then accesses a website's URL
home page by manually typing in the weblink or clicking on a
hyperlink, a simple link to enter a website. A user on the
darknet web or the Internet cannot unintentionally stumble upon
this website. The user must make a conscious choice to first
download and use special software such as the Tor browser, and
then must have the unique alphanumeric string that makes up the

URL in order to find and then access the site. Based on my
training and experience, Tor browser is known to be used by
pedophiles as a means to mask their identities and activities.

c.   When a user arrives to the website "365CP" only
12 video stills depicting child pornography with hyperlinks are
displayed, along with log in and registration options. Based on
my training and experience, the letters "CP" in the title of the
website "365CP" likely stand for child pornography, and the
display of only video stills depicting child pornography would
make the purpose of the website clear to a user prior to making
an account or payment.

d.   When a user chooses to enter the website "365CP,"
the user must create an account and make a cryptocurrency
payment in order to gain access to the website. After a payment
is sent, the user's account will be unlocked according to the
instructions on the website.

## VI. STATEMENT OF PROBABLE CAUSE

10.   Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

### A.   STELLA Accessed Coinbase to pay for Child Pornography on "365 CP"

11.   Based on review of reports obtained from Coinbase, I
learned that on or about July 13, 2020, STELLA submitted a
bitcoin transactional payment of $18.58 USD to the Bitcoin
wallet "1D3aQThytRGxD8xHefdhmvJqnMvHa55qhc" to gain access to
the CSAM website "365 CP."

14

12.   Additional Coinbase information provided for STELLA's
transaction included – User's ID: "5a2973778cc74c0103cff2cb,
User's Email: rob.stella1@gmail.com, User's Country: United
States of America, Transaction Detail Transaction Type: Send,
Transaction Detail Account Name: BTC Wallet, Transaction Detail
Account Currency: BTC, Transaction Detail Address:
1D3aQThytRGxD8xHefdhmvJqnMvHa55qhc, Transaction Detail
Transaction ID: 5f0cdbb254f6ae0311547be2, Transaction Detail
Hsh:
1c056cff5155037ac686379e6eb982a81ee7c0b938b7406df0bc54420b0a4110
, Name: Robert STELLA, First Name: Robert Quido, Last Name:
Stella, DOB Year: 1972, Phone Number: 619-672-9249, Street
Address: 17808 Maplehurst Place, City: Canyon Country, Postal
Code: 91387.

13.   Within "365 CP," I observed screenshots from the start
page provided by BKA via HSI C3. The screenshots included 12
video stills with hyperlinks, depicting child pornography, i.e.,
visual depictions of a minor engaging in sexually explicit
conduct, that were visible immediately once on the website's
start page.

**B.   Identification of Robert Quido STELLA at the SUBJECT
PREMISES**

14.   According to the California Department of Motor
Vehicles ("DMV"), STELLA lists his address as the SUBJECT
PRESMISES.

15.   As of May 17, 2021, according to Accurint - an
information database operated by LexisNexis which consolidates

public records, including addresses, phone numbers, driver's licenses, property deed transfers, corporate information, and other property records – STELLA is associated with the SUBJECT PREMISES and appears to reside at the SUBJECT PREMISES. Accurint reports also show the phone number 619-672-9249 is associated to the SUBJECT PREMISES.

16.  On May 19, 2021, I served a Federal Grand Jury Subpoena on Verizon for subscriber information for phone number 619-672-9249. On May 27, 2021, Verizon responded to the subpoena with the subscriber name as Robert STELLA, and the subscriber address as the SUBJECT PREMISES.

17.  On MAY 13, 2021, I conducted surveillance at the SUBJECT PREMISES and observed two vehicles parked in the driveway: a black Chevrolet sport utility vehicle bearing California license plate 8LNH985, and a dark blue Toyota Highlander bearing California handicap license plate 65097DV. According to the California Department of Motor Vehicles ("CA DMV"), both vehicles are registered to STELLA at the SUBJECT PREMISES.

## VII. <u>TRAINING & EXPERIENCE ON INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN</u>

18.  As set forth above, there is probable cause to believe that an individual at the SUBJECT PREMISES conducted a bitcoin transactional payment to log into the "365 CP" website to access child pornography. Based on my training and experience, and the training and experience of other law enforcement officers

experienced in investigating crimes involving the sexual exploitation of children with whom I have had discussions, I have learned that individuals who view and possess multiple images of child pornography, including on web-based bulletin boards and file-sharing programs, are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals:

a. Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media; or from literature describing such activity.

b. Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children often use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.　　Individuals who have a sexual interest in children or images of children may possess and maintain "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etcetera, in the privacy and security of their home or some other secure location. Individuals who keep hard copies typically retain them for many years.

d.　　More recently, individuals who have a sexual interest in children or images of children typically maintain their collections in a digital or electronic format. They typically maintain these collections in a safe, secure, and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly.

e.　　Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials (including through digital distribution via the Internet); conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. These individuals often maintain possession of these items for long periods of time.

f.    Individuals who access hidden and embedded child pornography-related bulletin boards, and other forums such as newsgroups and IRC chatrooms, are typically more experienced child pornography collectors. These individuals likely would have gained knowledge about such forums through online communications with other individuals who have a sexual interest in children or images of children.

g.    Individuals who have a sexual interest in children or images of children frequently prefer not to be without their child pornography for a prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

h.    Child pornography received via computer is extremely mobile. Through computer technology, digital files are easily reproduced and transported. For example, with the click of a button, images and videos containing child pornography can be put onto thumb drives so small that they fit onto a keychain. Just as easily, these files can be copied onto floppy disks or compact disks, and/or stored on iPods, Blackberries, or cellular telephones. Because someone at the SUBJECT PREMISES likely collects and values child pornography, which is easily-stored and duplicated, there is probable cause to believe that evidence of a child pornography collection will be found in the SUBJECT PREMISES.

19.  Furthermore, even if a person deleted any images of child pornography that may have been possessed or distributed, there is still probable cause to believe that there will be evidence of the illegal activities – that is, the possession, receipt, and/or distribution of child pornography – at the SUBJECT PREMISES or on his person. Based on my training and experience, as well as my conversations with digital forensic experts, I know that remnants of such files can be recovered months or years after they have been deleted from a computer device. Evidence that child pornography files were downloaded and viewed can also be recovered, even after the files themselves have been deleted, using forensic tools. Because remnants of the possession, distribution, and viewing of child pornography is recoverable after long periods of time, searching the SUBJECT PREMISES could lead to evidence of the child exploitation offenses.

### VIII.  TRAINING & EXPERIENCE IN COMPUTER-RELATED SEXUAL EXPLOITATION INVESTIGATIONS

20.  Based on my training and experience, and the training and experience of other law enforcement officers experienced in investigating crimes involving the sexual exploitation of children with whom I have had discussions, I know the following:

a.  Computers and digital technology have dramatically changed the way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

b.    Individuals with an interest in child pornography can now transfer printed photographs into a computer-readable format with a device known as a scanner. Furthermore, with the advent of digital cameras, when a photograph is taken, it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera to the computer. In the last ten years, the resolution of pictures taken by digital cameras has increased dramatically, meaning the photos taken with digital cameras have become sharper and crisper. Photos taken on a digital camera can be stored on a removable memory card in the camera. These memory cards often store up to 32 gigabytes of data, which provides enough space to store thousands of high-resolution photographs. Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive on the camera. The video files can then be easily transferred from the camcorder to a computer.

c.    A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the methods of distributing and receiving child pornography. Child pornography can be transferred via electronic mail or through FTPs to anyone with access to a computer and modem. Because of the proliferation of

commercial services that provide electronic mail service, chat
services (i.e., Instant Messaging), and easy access to the
Internet, the computer is a preferred method for distributing
and receiving child pornography.

d.    The computer's ability to store images in digital
form makes the computer itself an ideal repository for child
pornography. The size of the electronic storage media (commonly
referred to as the hard drive) used in home computers has grown
tremendously within the last several years. These drives can
store thousands of images at very high resolution. In addition,
there are numerous options available for the storage of computer
or digital files. One-Terabyte external and internal hard drives
are not uncommon. Other media storage devices include CDs, DVDs,
and "thumb," "jump," or "flash" drives, which are very small
devices which are plugged into a port on the computer. It is
extremely easy for an individual to take a photo with a digital
camera, upload that photo to a computer, and then copy it (or
any other files on the computer) to any one of those media
storage devices (CDs and DVDs are unique in that special
software must be used to save or "burn" files onto them). Media
storage devices can easily be concealed and carried on an
individual's person.

e.    The Internet affords individuals many different
venues for obtaining, viewing, and trading child pornography in
a relatively secure and anonymous fashion.

f.    Individuals can also use online resources to
retrieve and store child pornography, including services offered

by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services, as well as electronic storage of computer files in a variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

21.  As is the case with most digital technology, communications via a computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## IX. <u>TRAINING & EXPERIENCE ON DIGITAL DEVICES</u>[2]

22. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. A person who connects to the Internet must use a computer or mobile device, such as a tablet or wireless telephone, to facilitate that access. Furthermore, in my training and experience, these devices typically travel with a subject or remain in SUBJECT PREMISES. It is therefore reasonable to believe that computers, tablets, wireless telephones, and other electronic storage media may be present in SUBJECT PREMISES. Further, because it is possible to store certain mobile devices, such as removable storage media and wireless telephones, in a pocket, it is reasonable to believe that mobile devices may be found on the persons.

b. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

c.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

d.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

e.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading

25

filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

      f.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

      g.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

      h.  Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

23.  The search warrant requests authorization to use the biometric unlock features of the devices seized, based on the

following, which I know from my training, experience, and review
of publicly available materials:

      a.   Users may enable a biometric unlock function on
some digital devices. To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device. To unlock
a device enabled with a fingerprint unlock function, a user
places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second. To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts. Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time. I do not know
the passcodes of the devices likely to be found in the search.

      c.   As noted above, I know that most homes with
Internet capability use only one IP address. That IP address, in
turn, is often shared by many devices that access the Internet
using a wireless modem. Accordingly, if there are multiple
digital devices discovered during a search of the SUBJECT

PREMISES, any of those devices could have been used to access
the Internet and download the files discussed above.

        d.    Thus, if while executing the warrant, law
enforcement personnel encounter a digital device within the
scope of the warrant that may be unlocked using one of the
aforementioned biometric features, the warrant I am applying for
would permit law enforcement personnel to, with respect to
residents of the SUBJECT PREMISES, who are located at the
SUBJECT PREMISES during the execution of the search: (1) depress
the person's thumb- and/or fingers on the device(s); and
(2) hold the device(s) in front of the face of the person with
his or her eyes open to activate the facial-, iris-, and/or
retina-recognition feature.

       24.    Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

### X.  REQUEST FOR SEALING OF APPLICATION/AFFIDAVIT

       25.    It is respectfully requested that this Court issue an
order sealing, until further order of the Court, all papers
submitted in support of this application, including the
application and search warrant affidavit. I believe that sealing
is necessary because the items and information to be seized is
relevant to an ongoing investigation into criminal conduct
involving minor victims and as far as I am aware, the targets of
this investigation remain unaware that they are being
investigated. Disclosure of the search warrant affidavit at this
time would seriously jeopardize the investigation, as such

disclosure may provide an opportunity to destroy evidence, change patterns of behavior, or allow flight from prosecution. Further, based upon my training and experience, I have learned that online criminals often search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on this continuing investigation and may severely jeopardize its effectiveness

## XI. <u>CONCLUSION</u>

26. For all the reasons described above, there is probable cause to believe to believe that evidence, fruits, and instrumentalities of the SUBJECT OFFENSES, as described in Attachment B will be found in a search of the SUBJECT PREMISES, as described in Attachment A of this affidavit.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>8th</u> day of
 <u>July</u> , 2021.

_____  MAA
UNITED STATES MAGISTRATE JUDGE

# Magistrate Judge Case Initiating Documents

2:21-mj-03211 USA v. Warrant

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

**Notice of Electronic Filing**

The following transaction was entered by Brunwin, Christopher on 7/7/2021 at 3:39 PM PDT and filed on 7/7/2021

**Case Name:**        USA v. Warrant
**Case Number:**      2:21-mj-03211
**Filer:**            USA
**Document Number:** 1

**Docket Text:**
**APPLICATION for Search Warrant filed by Plaintiff USA. (Not for Public View pursuant to the E-Government Act of 2002) (Attachments: # (1) Proposed Warrant) (Attorney Christopher M Brunwin added to party USA(pty:pla)) (Brunwin, Christopher)**


**2:21-mj-03211-1 Notice has been electronically mailed to:**


**2:21-mj-03211-1 Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**N:\Brunwin, Christopher\7.7.21\Application for a Search Warrant (004).pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=7/7/2021] [FileNumber=32237076-0]
[6c8c80acce92b3d6f5a8dbe4886d97c9ab18de5af3f2597080e267d118922576c753
32ceff1ded45ffcc0f249745bd096e127fa77363613af894d3e85652c1e1]]
**Document description:**Proposed Warrant
**Original filename:**N:\Brunwin, Christopher\7.7.21\Warrant Search and Seizure Warrant (003).pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=7/7/2021] [FileNumber=32237076-1]
[af8f21d500a51bde96562eb0452658a1d611c730bd74c1d603b7aba30c20d5e19c62
49839f37d9b06cb38b40c5dc5bcc9b060431449d912cf24e029e81356553]]